And there is one case to be heard, which is 20-1494, Wang v. New York State Board of Election. I am informed by the clerk that counsel are ready. I should state for the record and for the benefit of counsel that they will be afforded an opportunity to speak for the full amount of time that's indicated on the calendar, without interruption, and that the questions of the bench will come after each segment of the argument, when I will turn to my colleagues in order of seniority to ask whatever questions they may have in mind. So let's begin with counsel Ms. Vail. Yes, Your Honor. And I'd like to request three minutes for rebuttal. Yes, indeed. Thank you. May I please the court, Judith Vail for the defendant. The district court erred in overriding the board's reasonable determination that the risks to public health and election administration from conducting an uncontested presidential primary during a historic pandemic were not warranted, given the unique circumstances here, including not only the pandemic, but also the fact that all of the candidates, except for one, had suspended their campaigns and endorsed the sole remaining candidate. In reaching this determination, the board applied its experience and expertise in what it takes to run elections, including how many more voters, poll sites, poll workers, and election workers are likely to be involved in person on the ground if the uncontested presidential primary goes forward. And the board reasonably determined that the and the social interactions that will be required raise the risk of COVID-19 spreading further, thickening, and even potentially killing more people. And to give some examples of what the board was facing, the board estimated that if the presidential primary went forward, there would need to be 615 more poll sites on June 23rd, 22 more early voting sites, more than 4,600 poll workers in addition, and 1.5 million more eligible voters who might come to the polls. And the impact of the number of people increasing and the risk increasing matters not just in rural, less populous areas, but also in more populous areas too, particularly where in many of these areas, there would not be any other Democratic party primary without the presidential primary. So, for example, there are significant areas of Staten Island and two election districts in Kings County that won't have any other Democratic primary without the uncontested presidential primary. The same is true for entire counties like Columbia, Dutchess, Putnam, and Broome counties, areas that include cities like Binghamton, Poughkeepsie, and Beacon, to name a few. And even though there will be some primaries or elections in many of these more populous areas, without any other Democratic party primaries, there will be significantly fewer voters and fewer poll workers, election workers, and poll sites needed. And that makes a big difference when you're talking about a pandemic, where even a few people getting the virus because they were working at the polls or working on sorting absentee ballots after election day, even a few people getting the virus means that there is more risk of those people spreading it onto others and then onto others. And the board was facing risk, not just from what might happen on June 23rd, although that certainly was a big factor, but also early voting days and the in-person work that it will take to sort and process the enormous surge in absentee ballots that is expected. And of course, you know, encouraging and using more absentee voting is a good safety precaution that the board and the state is trying to encourage, but many, many more absentee ballots than the state usually processes means that many, many more workers will be needed to process those ballots. And this is a difficult, a very difficult matter for the board to find the people, find the space, especially under restrictions for social distancing and trying to keep everybody safe. And there's a lot of different ways to parse election geography and parse the numbers of, you know, how many voters and how many people we're talking about, but any way you parse that, the board reasonably determined that not holding uncontested primary will make a significant difference in decreasing the number of people and decreasing the number of workers involved. And in addition to the health factor, the board also reasonably determined that not holding the primary will also decrease the strains that are already being greatly placed on the state board of elections, the county board of elections, and trying to hold efficiently and effectively the contested primaries and elections that are still going forward. And given these very strong, compelling public health and election administration interests that the board has, the board reasonably determined that taking those risks was not warranted when balanced against the attenuated burdens that might fall on the plaintiffs or people like them here. And those, any of those burdens are attenuated here because of these unique circumstances that all of the candidates except for one have not only suspended their campaigns, but also affirmatively endorsed the sole remaining candidate. And suspending your campaign and supporting another candidate does essentially suspend the campaign for delegates as well, because there is no direct selection of delegates that is separate from the contest for the presidential nominee. The only way that delegates can be advocated via the primary is through votes for the nominee. So that, you know, this is this connection, this direct connection between the race of the nomination and the race for delegates is part of the reason why it was always the case in New York law before the pandemic that, number one, if there was a presidential candidate who qualified for the ballot, that person might lose access to the ballot later, for example, if litigation later disqualified them or if they had filed a petition for declaration. It was already the law before the pandemic and before the new provision that if a presidential candidate did lose access to the ballot, then that candidate's delegate, wedged delegate candidate also came off the ballot. Because once the candidate comes off, there is no more race for delegates for that candidate. And it was always the long established rule in New York that if you end up with only one candidate in a primary, that primary does not go forward. The board's decision here is of a piece with these principles of New York law. And it was made in the very specific context of both the pandemic and the for the nomination when the board made the decision. And thus, there was not active campaign for delegates. And, you know, requiring that a candidate maintain, at least maintain an active tendency to keep access to the ballot is can be thought of as the flip of many ballot access rules in New York and otherwise that require candidates to have some modicum of support before they get access to the ballot in the first place. And what the legislature and the board did here was say that if a candidate had not maintained some modicum of an active candidacy, then especially when all of the candidates except for one had suspended and the state was facing a pandemic, that the primary should not go forward. And this is what the legislature contemplated when it enacted these new provisions. It enacted those provisions in the context of the pandemic already leaving the state and the primary had already been postponed at that point from April to June. And it was at that point where the legislature authorized the board to have another opportunity to sort of take the temperature of do we have a contested primary or not? And if the answer was no, the board would have the authority to decide that taking the risk was not warranted. And here, you know, all of the candidates not only except for one not only suspended their campaigns, but they did have the opportunity, they had about 23 days from after the legislature enacted subsection 13 and 14 to decide to unsuspend their campaigns and to again seek the nomination for themselves rather than for former Vice President Biden. And if they had done that, they could have avoided the result of losing access to the ballot and as a result, having the delegates come off the ballot as well. And, you know, none of the candidates chose to do that despite having the opportunity. And, you know, they didn't do it after the statute was noticed that the board was going to take a vote on whether to exercise its authority. And, you know, another one more factor here that I think is worth taking note of is that there is no the Democratic Party and the committee can decide to allocate delegates in a different way that might favor plaintiff's interest here without needing to do a primary that would risk health and safety during the pandemic. There will already need to be some change in the delegate plan because if the primary were to go forward, it is already past the deadline set by the Democratic Party. So there already does need to be changes. And so the party and committee can address the situation. And, you know, the import of that is there are ways for plaintiffs to still work with the party, the committee, other candidates to find a way to further their associational interest here. And indeed, Senator Sanders has already been doing some of that negotiation. I understand that it has not been formalized, but it is underway and at least possible here. And, you know, when the board made the decision to take the candidates off the ballot, you know, I think it's worth emphasizing, too, that the board did not have other options within its authority. Some of the alternatives that have been suggested like an all-mail-in primary or, you know, changing the way that absentee ballots are sent in, that is not within the board's authority to do that. And, in fact, you know, at that point, the governor had already decided that although absentee ballots are absolutely going to be encouraged as much as possible, the elections on June 23rd are not going to be going by all-mail. And that is not going to happen. And the governor said publicly that he did not think that he had constitutional authority to make that decision. And certainly the board doesn't have the authority to make that decision. And so, you know, given that the primaries and will not be all absentee, holding a presidential primary means that there will be more voters who are eligible and that there will need to be more poll sites and poll workers and election employees hired, trained, protected, given protective equipment, and asked to do more work to conduct the election. And, you know, these were hard choices that the board faced, and it made a reasonable decision given those circumstances. Thank you very much, Ms. Vail. I'll turn now to Judge Kearse if she has any questions for Ms. Vail. Yeah, I have one question. You say that the candidates who suspended their campaigns had a few weeks in which they could have elected to unsuspend their campaigns and avoid being taken off the ballot. What would they have had to do, in your view, to accomplish that? Would it have been sufficient just to send a letter saying, I do not, I no longer have suspended my campaign? Yes, I think they would have needed to send a letter to the board or otherwise make clear that they were unsuspending their campaign, and also that they were seeking the nomination for themselves, not for former Vice President Biden. But the law, you know, the legislation law does require an unsuspended campaign. You do not need to spend any particular amount of money, hold events, or put any specific amount of effort into it. I mean, that is always the candidate choice. But they would have had to declare clearly their intention to unsuspend and to seek the nomination for themselves. But they wouldn't have had to actually do anything? Not in terms of, yeah, spending money, holding events, making phone calls, you know, any of the sort of campaign activities that one might normally do, you would not be required to do that. So how does that differ functionally from what Senator Sanders did, which was to simply ask not to be taken off the ballot? Because he did continue to have his campaign suspended. And I think the word, you know, declaring a suspension does have understood practical meaning in the area of campaigns and election law. It is often the case that candidates say specifically that they are suspending their campaigns, because that allows them to keep most campaigns, not all campaign activities, while still being able to pay off campaign debt using campaign funds, and still having the opportunity to potentially jump back in the race. So Ross Perot actually suspended his campaign in 96, and then jumped back in the race. And so the suspension language does give the opportunity to come back in, and the candidates did not do that, sir. Thank you. Judge Jacobs. Counsel, you refer to the opportunity to jump back into the race. Ordinarily, when people suspend, it's because they run out of money, and they can't pay their workers or the rent or whatever. But one way people would jump back in is if they did well in a primary. And I would wonder whether some or many of the people who have suspended their presidential campaigns would in fact jump back in if they did quite well in a in a presidential primary in New York. So the question becomes whether this becomes self-fulfilling prophecy. If you suspend, you can't appear on the ballot. If you can't appear on the ballot, you can't get the public support that brings in the money, can't bring in the money, you can't resuscitate your campaign. Yeah, I mean, I agree that this law and the board's decision here that, you know, did require the candidates to make a decision a certain amount of time before the primary about whether they wanted to suspend. Senator Sanders decided to suspend after this law was enacted. Or to unsuspend rather than risk having their losing access to the ballot. That decision does need to be made. And, you know, that might be a difficult choice for candidates to make. But, you know, I think everyone was facing difficult choices. And, you know, there are, you know, candidates who, you know, decide to go even a step further. They may have to file a petition for declination in New York and even more formally withdraw. And they can't change their mind after that, even if it turns out that suddenly there is a huge wave of support. Counsel, if there is no presidential primary on June 23, I think it is, how many of the 62 counties in New York would have no voting at all for anything? I mean, for state assembly, state Senate judges, or whatever. Yes. There are two counties, Franklin and Washington, that would have zero primaries. There are another three counties, Lewis, Dubin, and Yates, which technically would still have a SAM party primary, but there are zero voters in those counties who are members of that party. So that is functionally like having no primary. And then there is another county, Jefferson, which similarly has a SAM party primary, but there are eight voters who would be eligible to vote in that county for that primary that was remaining. And, you know, as I said, although there are many counties that would still have some primary, there's also, you know, there could be a very small primary in one city, let's say, and that doesn't mean that there are other equal areas of the county that would have no primaries. So, for example, in Clinton County, although there is, I think, some remaining primary, 14 towns in Clinton County would have zero primaries, and 17 out of 18 towns in Essex County would have no primaries. And there are more examples of that, but just to emphasize that county is not the only way to course election geography. Council, perhaps one regrets referring to presidential primary as a beauty contest, although in some respects I suppose it is, but is it not true that delegates at the convention vote for vice president? It is true that delegates in the normal course when there is a contested primary, there is also a contested primary for delegates, and delegates do matter in the normal course. They do have a role at the convention, but the unique circumstance that happened here was that once all of the candidates for the nomination suspend and then come off, then there is no more race for delegates, even if they have a safe, you know, delegates in the general have a role to play. If there is a race for delegates, and I know you don't concede that, but if there was a contest to become a delegate, it would be a contest to become a person who at president. If there was a contest for delegates, then yes, the delegates that would get allocated do have roles at the convention. You know, I forget now exactly if there was a vote for the nominations at the convention or if that's another step down the road, but I agree that delegates, if there was a contested race for delegates, then those people who are selected have a role to play, but the critical part here is that there was no more contested race for delegates, and just to emphasize, you know, if, for example, a nominee does not make the threshold vote, a presidential nominee does not get a threshold vote, then their delegates, there's no delegates that get allocated, even if a delegate, a particular delegate got 100% of the vote, so the vote for delegates only orders the slate amongst themselves. It does not allocate any delegates, and so there is no separate race for delegates getting allocated, and so that is why without a contested contest for the nomination, there was no contested contest for delegates. Counselor, you've cited about five or six counties in New York that would have really no elections at all but for the presidential primary. Can I assume that they're upstate, more or less rural counties, even if they do have a county seat, and that their profile in terms of coronavirus infection is not much different from that of Tennessee or Kentucky? It is true that the ones with sort of zero or functionally zero primaries in the whole county are upstate, but again, there are portions of other counties that would have no primary at all, and I think more critically, there are portions of counties or even whole counties more downstate, like such as in Putnam, that would have no Democratic primary without the presidential primary, and that still makes a significant difference in the number of people that are you're going to need when you're thinking about how many voters might be eligible. That's Richmond County, I take it, which is Staten Island? Yes. It's not the whole county, but the significant portions of Staten Island would have no other Democratic primary. Thank you for answering my question. Thank you. Counselor, this is Judge Cabranes. I appreciate your arguments on what you call the principles of New York law, but let me ask you a few questions to help me to understand your position here about some principles of US constitutional law, and I draw your attention in particular to the First Amendment right of political parties to determine the right and the rules by which their members participate in its affairs. Let me begin with a threshold question. There is no argument here that plaintiffs have established their article freestanding. Is that right? We are not yet. We are not pursuing that argument on that level. Okay. Let me turn to the First Amendment rights of political parties. You're familiar with the case of Tassian against Republican Party of Connecticut? Yes. And as you may recall, in an opinion by Chief Justice Thurgood Marshall, who knew a few things about freedom of association and political parties, the Supreme Court stated, I'm going to quote Justice Marshall's words, the power to regulate the time, place, and manner of elections does not justify without more the abridgment of fundamental rights, such as the right to vote, unquote. And what I'm interested in knowing is what is the position of the state and national democratic parties here? Don't they have something to say about this? I do not know their position. I cannot speak for them on this. But it is true that by legislation, New York has effectively usurped, if you want a strong word, or taken over the role of the Democratic Party committees of New York State and the Democratic National Committee, which ordinarily are the bodies that determine when and how the primaries are to be conducted. Isn't that right? No, I don't think that's right, that the state has usurped that role here. I mean, the state has put on... Strong word. Let's use it a mild word. It has displaced the role of the political parties, right? Well, the political parties can still... The state and the board are not stopping the political parties from changing the way in which they allocate delegates, given the circumstances here. And that will already need to happen. There will need to be changes already, given that the primaries have been... Many primaries have been postponed, including the ones in New York. And they do have flexibility. It is ultimately up to the party and the committee to decide how to adjust and respond to the pandemic, the postponement of primaries, and the valid access provision here that was implemented by the board, given the pandemic and the uncontested nature of the race. Let me follow up on a question that Judge Jacobs asked you about the delegate's role at the convention. There's no disagreement that, in addition to casting ballots for the presidential nominee, the delegates have a wide range of roles on various committees, platform rules, et cetera. Isn't that right? That's true. The delegates do have a role. And it matters for delegates and for their nominees. But without a contested race for the nominee, there is no contested race for delegates either. I'm not sure I quite understand that. I'm going back to Judge Jacobs' question as a simple example or hypothetical. The delegates at the convention would be voting for a vice presidential nominee. And it's entirely possible that such a vote would be cast without reference to anything that occurred in the primaries beforehand. Let me give you a historical example that came to mind as Judge Jacobs pursued this. In 1956, the Democratic National Convention selected Adlai Stevenson of Illinois as the presidential candidate. And he did not run with a vice presidential candidate. And indeed, he elected in 1956 to leave that matter open to the convention delegates. So it is a fact that at the Democratic National Convention, the delegates who had been chosen in theory for presidential nominees cast votes and thus nominated Estes Kefauver of Tennessee as the vice presidential candidate. I'm not sure you're familiar with that particular episode, but take it from me. We do agree that the delegates play a role at the convention. It's not an unimportant one because in a national election, the vice presidential nominee, as you can name all of these examples, the choice of Lyndon Johnson in 1960 served a particular political purpose of the party and its members. That is, as a nod to a certain part of the country. I don't understand how that wouldn't be true here. At this Democratic National Convention, the choice of a vice presidential nominee may nominally, or at the threshold, be in the gift of the presumptive presidential nominee. But it's not clear to me that the other candidates and their delegates wouldn't have a very significant role to play in assuring that their particular political perspective was represented on the national ticket. Of course, delegates have a role and potentially a very important one. I think the point here is that when a nominee suspends their campaign and endorses the other candidate, they are also suspending their own campaign for delegates and endorsing the other candidate to get delegates because you get the nomination through getting delegates, and delegates can only be allocated through the primary through votes for the nominee. So no matter how many votes a delegate individual gets, they cannot get allocated to go to the convention without a nominee getting votes. And so with all the nominees suspending their campaign, there is no remaining contest for the delegates. No, I understand. I understand completely. It's a practical matter. We're speaking of there is no longer a live contest for the nomination for president. But as Jacobs asked, to use a simple example of the vice presidential nominee, you can very well imagine that there are different elements of the Democratic Party that would wish to encourage the presumptive nominee to select the vice presidential nominee for any number of reasons, not the least of which would be to provide balance of some kind, political balance, and permit the delegates to express their protected by the First Amendment right of political parties to set the rules for participation by its members. I understand that. But I think the critical point here is that the delegates do not have a right to be elected to go to the convention that is independent from the candidate. No matter how much a delegate wants to go and wants to express their views, they do not have a right that is separate. And so if your candidate doesn't make the 15% threshold, there are no delegates that get allocated no matter what. And here, the primary, I know there are many reasons why, policy reasons why, primaries are often preferred, but there is an independent constitutional right to allocate delegates by primary or to do the nomination by primary. And that's not a New York state law either. And I know that the party has set out rules for the primary, but there was a seismic shift in the circumstances that everyone was facing. And the primary is only one point along the road. Even the vote for delegates within the party does not necessarily correlate one-to-one with the delegate being selected. And the party and the committee, they have not intervened here to object. And they still do have the opportunity to change the way the delegates get allocated. And I think it is important to remember that absolutely... Hold on there. Hold on right there. I'm interested in what you just said. Explain to me how this... This is a matter of helping us understand the record in your position. Don't misunderstand my comments as having a settled view on what the result of this case ought to be. But you just said that there's still going to be an opportunity for the elected government. Well, I think it's up to the Democratic committee and party. They are going to have to change the delegate plan already. And there are already negotiations going on, at least with Senator Sanders and former Vice President Biden and the party and committee about what should happen given the circumstances that everyone faces. Hold on a second. I understand. Let me perhaps ask this in a series. Just try to parse some of these questions. You are not disputing that the elected delegates at the convention can also cast votes on platform issues and issues of party governance, right? No. I mean, yes. They're very cool for how people get onto committees. Yes. There's no doubt. Delegates have some influence at the convention. That is right. Influence? Wait a minute. What do you mean some influence? I thought it was the delegates, in fact, that have to vote on the platform and on party governance. Let me give you a simple example. The convention will have to act on the rules of its own proceedings and it will have to vote on the party governance rules in the future. That is, how will the next quadrennial primary season be regulated? Is it not the case that the national convention is where these rules are? Now, admittedly, it's not exactly one of the great deliberative bodies, but they are the people who make these decisions, perhaps ratifying the views of delegates, right? Yes, but I don't think that the degree of influence at the convention is what matters. I think we agree that there is influence and the degree is not what matters because without a contested race, the delegates cannot get there. I think if nominees for president, there are many reasons why a nominee might want to stay in the race and retain the ability to get their delegates into the convention to have influence, to have all of that influence. There are many reasons why somebody might want to stay in the race and have that influence, even if they think that they aren't likely or maybe impossible to get the actual nomination. But if that's what somebody wants... Hold on a second. Hold on. So I take it you would not disagree with the proposition that the cancellation of the primary modifies the interests of the parties, or you could say they might claim that it interferes with the interests of the plaintiffs, but it does have an effect on the policy issues at the convention. You're not disputing that? I think it had an effect on whether the uncontested primary was held and whether... No, I'm not talking about the uncontested. I'm talking about the convention. Well, I mean, I think there are many steps to get there. I mean, I think, yes, it influenced how, whether or not the primary was held, which in turn influenced whether there were the allocation of delegates. But here, all of the candidates decided not to continue an active campaign to get delegates, to get that influence. They chose to suspend their campaigns and to not unsuspend them when there was a risk that they would lose ballot access if they didn't do so. And so there are many reasons why... Hold on one second again. Please, please. Let's all catch our breath here. Short sentences, short paragraphs, if possible, on both our parts. It is a fact, is it not, that the state changed the rules of this game after the various presidential candidates suspended their campaigns. Isn't that right? Not for Senator Sanders. Senator Sanders suspended his campaign after this law was enacted. All right. Let's talk about Mr. Yang, who's the lead plaintiff here. The retroactive application of a newly enacted law must have affected his associational rights under the First Amendment, right? Well, I think even if there is some burden here... When he suspended his campaign, he didn't know about this statute. I understand there's the pandemic, but I mean, he had no way of knowing when he suspended his campaign that he would not have the right to participate in the primary in this limited way. Isn't that a fair statement? Yes. When he suspended his campaign, that was before this law was enacted. That's correct. But after the law was enacted, there were 23 days in which Mr. Yang could have unsuspended his campaign and simply said, because I still want to have all of the influence that we've been discussing, all of the very important influence that we've been discussing, I'm going to unsuspend my campaign and keep my name on the ballot and therefore keep my delegates' names on the ballot. Let me ask you this. This statute and this action by your clients only affects the primary for the nomination, the Democratic nomination for president. Is that right? Correct. I mean, the subsection 14 then says that any of the nominees for president that lose access to the ballot, that no one's delegate can... I understand. Well, I'm simply trying to understand the record and I want your help on this. Yes, but this is only after the presidential... Only the presidential nomination was eliminated. Is that right? Through this provision, yes. In other words... Through this provision, yes. In other words, on primary day in June, there will be primary contests throughout the state of New York, except for the counties that you and Judge Jacobs identified. There will be primaries, but there will be no... The only primary that was eliminated was the presidential primary. Isn't that right? Through this provision, yes. I think there have been some special elections that... What we're talking about is this provision. That is, there's no other law before us. We're talking about the statute that was adopted in April by the state legislature, right? Yes. I agree that the presidential primary is the only one that these provisions affected, and yes, there will absolutely be other primaries. Doesn't it seem odd to you that somehow these other political contests will go on and the only one that's been eliminated is the presidential primary? Doesn't it suggest that there's some particular objective here that were perhaps not obvious to any of us? No, no. I think when you look at the context of the legislature enacting this law and of the board exercising its authority under it, it was all in the context of the pandemic and the primary, specifically the presidential primary, and only the presidential primary, had already been moved from April, where it was separately, to June. In that context, there was the prospect of... The legislature was thinking about the prospect that the presidential primary, having been moved out to June, might become uncontested. When the legislature enacted this law, it was still contested. Senator Sanders was still in the race, but by moving it and looking at... There was a significant possibility that there would be an uncontested, specifically presidential primary during the pandemic. That was what the legislature was thinking about and was the specific circumstances that faced the board. I'd just like to add that, yes, this provision only affects the presidential primary, but there are other races where, if it becomes uncontested, it is already the law in New York that those primaries don't go forward. Hold on, hold on. Let's all catch our breath. Has any other state canceled its presidential primary? No. Other states have postponed their primaries, like New York did, but as of right now, no other state has a statute. That's quite unusual, obviously, by definition. What is your response to the plaintiff's argument that the appeal simply came too late? That is, wouldn't it be virtually impossible to cancel? No, Your Honor, because the presidential primary ballot is completely separate from the other ballot. Oh, it's physically separate? It is a physically separate ballot, and any way this appeal goes, the content of the ballot is not going to change. It's not like one person is going to come off or on. It is also not the case, even in the normal courts, that no changes can be made to a ballot after the 45-day window for sending out the military overseas. It is already the case that there's ongoing litigation for other primaries, where sometimes candidates get disqualified through litigation, or there's fights about the ballot past that 45-day window, and federal law does provide for ways to address that. In this instance, there isn't even a sort of Move Act implication, because the content of the ballot doesn't need to change either way. Thank you, Ms. Vail. Maybe my colleagues may have some questions before we turn to opposing counsel. Judge Kearse? No more at this point. Judge Jacobs? Not at this point, thank you. Okay, so we'll hear from opposing counsel. We've kept you on quite a while, and we appreciate your argument very much, Ms. Vail. Thank you. Thank you. Thank you, Your Honor. May it please the Court, Remy Green on behalf of intervener appellees. Before I launch into the argument proper, I'd like to quickly hit what seems like what the Court thinks is the most important point. At Joint Appendix 99, you can see the letter that Senator Sanders' campaign sent to the Board of Elections that quotes from his, and provides a link to his video statement suspending his campaign, in which he says, on a practical note, let me say this. I will stay on the ballot in all remaining states and continue to gather delegates. And then a little bit later, we must continue working to assemble as many delegates as possible at the Democratic Convention, where we will be able to exert significant influence over the party platform and other functions. So to the argument that Senator Sanders intended to cease delegate races, I think that that has absolutely no support in the record. And to Judge Kearson's point, I think that the letter he sent to the Board of Elections is exactly what they're claiming he should have been allowed to do in unsuspending his campaign. So with that, I'll just launch into the argument proper. The District Court correctly found that there was a clear and substantial likelihood that the Board violated the Constitution when it decided to remove qualified candidates from a ballot after that ballot was certified. As the Court below observed, state laws governing who may appear on the ballot can implicate two different and for the advancement of political beliefs as candidates or party members. And second, the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. On appeal, the Board still does no more than show that the asserted state interest is important in the abstract and not advanced by the measure employed. And even on their reply, even though we've challenged them on this, they fail to even acknowledge the voters' rights at the right for voters, although I think this conceded their arguments, the right that delegates have to vote at the convention. Thus, the Court should affirm the Court below for at least three independently sufficient reasons. First, that removing candidates from the ballot using a law passed in the middle of an election cycle places a severe burden on the rights of voters and candidates alike. And this Court should not be the first Court to ever find application of a mid-cycle law that removes candidates from a ballot to be constitutional when applied in that very same cycle. Second, that the measure employed fails to balance the weighty burden it places on the right to vote and access to ballot with measures that actually and meaningfully advance the identified government interest. And finally, as Your Honor noted, voting has already begun, and the Supreme Court has long counseled that changes on the eve of an election should be finalized. Finally, I think as relates to all points, the Court should also affirm that simply invoking the word pandemic is not a shibboleth that changes the applicable standard of review. My friend, I don't think, cited one case in her argument, and no matter how weighty the government interest is, the Constitution requires some form of search and review, and that requires looking at what other courts have done and looking at precedent for how the balancing plays out. So the Board does not here cite a single case for their argument that different standards of review apply in a pandemic, and fails to offer any limiting principle for these wide-ranging powers they assert. As to the kind of factual points that my friend made, I want to note that in terms of the Democratic primary versus general primary argument that's made as concerns, for example, polling places in Kings County, when I go to my polling place, there are four different districts that are polling there. So the fact that of the 1,800 polling places or districts in Queens, and I think I'm using the right term, but of the 1,800 districts in Queens, it is not true that closing one of those would require closing a polling place entirely, right? When you share four different districts in one polling place, that polling place is still going to be open. And second, my friend asserts there is some strain by health holding this not going to have to open up polling places entirely, and those are all upstate counties. Beyond that, though, the Board has now employed third-party vendors that are going to be sorting through ballots out of state, and these are all scanned by machine, right? There is not a substantial strain that comes from adding one more contest to a long list of contests where ballots are already being reviewed. Finally, my friend also argues that New York law has always allowed this to be the case, and that's just not true. New York has never imposed consequences of this kind for suspending a campaign. What New York does allow is if you file a declination within, I believe, three days of being nominated by petition for a particular position, within those three days, you can get off the ballot. In certain limited circumstances, the New York law also allows you to get off the ballot if you die. But beyond that, once you are on the ballot, once you are qualified, absent, say, a challenge to the validity of your signatures, there's virtually no way to get off the ballot. And I think rather than being an application of consistent New York law, this is a sea change in the way that New York election law applies to these kinds of contests. And so one of the arguments my friend made, well, this is just the flip side of showing a modicum of support. I think that this court actually analyzed a very similar question in the Green Party case, where, yes, signature requirements can be used to require showing a modicum of support, but, and this is the flip argument. The legislature in Green Party had passed a measure that allowed Green Party candidates, or I'm sorry, the Green Party status as a party under the election law to be revoked if it didn't continually meet that modicum. And once you made the showing of the initial modicum of support, this court found it to be a severe burden to require you to continually demonstrate that modicum of support. I think that that lines up with the way that this court analyzes things, as set out in the Lehrman case, where everything about the election law needs to be analyzed in context, right? It requires that if you already have a measure, for example, a measure requiring a showing of modicum of support, you don't have to keep campaigning and spending certain money when, to show that you have that modicum of support on, in an ongoing way. And certainly you shouldn't be required to show that by a law passed in the middle of an election cycle. So in our brief, we basically put two challenges to the board. First, we asked them to discuss in any way the burden on voters. And two, to find a single case sustaining, quote, legislation that has been found constitutionally sound when enacted during an election cycle that disqualifies previously qualifying candidates from appearing on the ballot. And that's in our brief at 36 to 38, quoting the Flindexter case. Even now, the board has not once identified, addressed, or acknowledged the burden this law places on voters, as the court found. And in their reply brief, still, the board failed to address voters' rights directly. To that end, though they took some pot shots at the Sanders brief, they didn't engage at all with the 266 voter brief, where voters themselves set out the weighty and important interests and kind of the personal and political and speech-based concerns that they have and interests that they have. The fact that the voter-related holding on constitutionality remains basically unchallenged, is enough to sustain the entire injunction. So in conclusion, I just want to say, I think the district court did exactly what it's supposed to do here. As set out in the Anderson case, the job of analyzing election restrictions is hard work, and it involves an in-depth process. And the board has not met its burden on appeal of showing that the district court's thoughtful weighing of the various burdens amounts to something that is an abuse of discretion. And with that, I will let your honors ask me questions. Judge Keirs? No questions, thank you. Judge Jacobs? Counsel, your emissary explains that the delegates are subsidiary to the candidate, and they appeal on the ballot or not, depending on whether the candidate is on the ballot, and that they had been removed pursuant to rules as to what candidates ought to be on the ballot. There's a certain logic to that and a certain neutrality about it. You referred hypothetically, I think, to what happens if a candidate dies. But surely, if a candidate dies, wouldn't you agree that the delegates go off the ballot along with the candidate? Yes, your honor. So to the end of the question, I think the answer is yes. If a candidate dies, and that's one of the well-settled ways that New York election law allows you to get off the ballot, in rare instances, that works that way. However, it is not settled. In fact, it has never been the case that you can get off the ballot for suspending a campaign. And so, when Sanders made the announcement, his announcement included the idea that, yes, I'm going to stay on the ballot and continue collecting delegates, because that's the goal here. And that is the particular bargain he made in the context of a pandemic. And so, the idea that that can be overridden by the board has no grounding in the law. And contrary to my friend's position, it is not how New York election law has ever worked. Your honor, this is Arthur Schwartz on the co-council with me on the screen. I'm going to disagree with that statement, because New York election law does not allow a need to come off the ballot if a candidate dies. The law expressly says, and I don't have the site right in my head, but it expressly says that if a candidate dies, their name stays on the ballot. Mr. Schwartz, hold on. You're not on yet. I appreciate your intervention. It's fine. We'd love to hear from you. We will hear from you. But the previous counsel, Remy Green, is on, and he is answering questions. He is answering questions posed by the bench. So, I'm going to let counsel attorney Green proceed. Thank you, your honor. Mr. Schwartz is co-counsel, and according, and based on a motion we made, I believe yesterday, we had understood he would be able to back me up on matters of party rules and election law, but I will defer to his expertise and, in fact, restate my answer, if you'll allow me. Yes, your honor. Go ahead. No, finish, Mr. Green. So, to the point, the election law doesn't allow you to get off the ballot, or allow delegate candidates to get off the ballot if the underlying candidate dies, but even if it did, that would be profoundly distinct from the situation here, where all that has happened is a suspension, which has never been a way to get off the ballot in New York. Yeah. It is my impression that people stay on the ballots when they die. I seem to remember in law school having that happen in the election. I think I voted for the dead person, actually. Let me answer this. Are there states that have not yet had a Democratic presidential primary? Yes, there are such states. Are they going forward with them? They are. As of today, all 49 other states are going forward with a Democratic primary. But surely many of them have already had a Democratic primary. Yes, and I don't know the exact number, but most of them, I think, at this point have had their primary. But some are still scheduled to have their primary. That's correct. Okay. And you happen to know what states they are? Are those hard-hit states with the coronavirus? So, there is a variety. I know, for example, New Jersey, which has been relatively hard-hit, has not held a primary yet and will be holding it very soon. The same is true of Connecticut. While, of course, there are less hard-hit states that also have their primaries to come. Okay. Thank you very much. Those are my questions. Attorney Green, I just want to get a few facts straight here. Maybe you can help me to understand the chronology of events here. The statute at issue was enacted on April 3, 2020, right? That's correct. Against the backdrop of the current pandemic, right? I mean, the pandemic was the occasion for the adoption of this legislation, right? Yes. And the resolution that removing Mr. Yang and Mr. Sanders from the presidential primary ballot pursuant to this statute was adopted on April 27, correct? Yes. The measure, as delegated by law, passed much earlier in the month. The resolution was on the 27th. So, the question that surfaces by opposing counsel, Ms. Vail, is that why didn't Mr. Yang and Mr. Sanders reactivate their suspended presidential campaigns in the weeks between April 3 and April 27? Well, two points in response, Your Honor. As Judge Pierce's question suggests, I think, reasonably read, the Sanders campaign did. They sent a letter saying, we intend to be on the ballot. Please do not take us off the ballot. We think it would be illegal to take us off the ballot. And so, that letter reached the board before its decision. And so, I think, to that point, I don't think that they could reasonably be understood to have needed more, particularly where the board didn't tell them they should have done something else. But beyond that, I think that the board's argument is a little bit disingenuous in terms of how it reads the statute. The statute itself only says, once a candidate has made a public announcement that they are suspending their campaign. It doesn't contain any language suggesting that you can unsuspend and that that should affect the board's decision at all. So, to the point, I think, because the board took the letter that the Sanders campaign wrote them and said, well, we don't think that this is enough, I don't think that there's any reason to believe that if they had just used some magic words and said, well, we're unsuspending, in addition to saying, please, please, please don't do this, we don't want you to do this. I don't think there's any reason to think that the board would read the language into the statute in order to accommodate them when they didn't use the discretion provided by the statute already. Okay. Now, your co-counsel, Mr. Schwartz, I'm sure would like to, I don't know how much time is available under whatever the arrangement was with the clerk, but Mr. Schwartz surely wishes to be heard. Go ahead, Mr. Schwartz. Mr. Schwartz. None viewed. Thank you for having me present, your honor. I just want to be helpful. Well, hold on one second, Mr. Schwartz, we seem to have some electronic problems, or at least at my end. Yes, my end as well. Mine too. Okay. So then perhaps you can speak either in a different way into your device. No. We can proceed and hear from Mr. Curzon and come back to you, Mr. Schwartz. Is this any better? Yes. Yes. Okay. For all the fancy earphones. Your honor, thank you very much. I just want to make a couple of brief points. I wanted to just point out two other times when there was an agreed upon candidate where there were votes on vice president. In 1964, Julian Bond was the selection of Lyndon Johnson, who was a big hero at the time. There was a roll call vote, and he was a candidate of the civil rights movement. In 1968, a lot of people forget this, John Lindsay, who was then the mayor of New York City, ran for vice president on an anti-war platform, and there was a roll call candidate in the party. The court was also correct in asserting that the delegates make very important decisions about party rules back in four years ago. At the convention, and as a result of the role of various delegates, they eliminated the vote of superdelegates, which are various party leaders, elected officials, etc., on the first ballot at the convention. That happened because there were 42% of the delegates that were pledged to Senator Sanders, who made that demand. There is an extremely important role for delegates to play at the convention. The attorney general argued that once there's a presumed presidential candidate, the delegates have no role to play in this particular convention this year. In fact, Senator Sanders, before this law was passed, had already amassed over a thousand delegates to go to the convention. At the time, I think there were still about 25 states left to vote. Several have had primaries since then, and Senator Sanders got almost 30% last week in a vote in a state that did a mail ballot. If there was no role for them to play, he wouldn't have made a point of continuing to run and amass delegates to go to the convention. There are critical free speech questions and associational questions that come into play at the convention. The attorney general also talked about an unsuspension process. The statute didn't say a word about a candidate may unsuspend. The statute, which by the way has no legislative history, the attorney general said the legislature made a determination. It was on page 330-something of a 500-page bill. There was a half a page of text that had this particular provision. There's no legislative history at all discussing about what it means, how it should be interpreted. There certainly is nothing in the statute that the Board of Elections relied on that said one word about unsuspending or publicly, the candidate could publicly unsuspend. The counsel for the state also said in the beginning of her argument that the Board applied its experience and expertise. The experience that, I'm not sure what experience they were talking about, because A, they had never had an election before where the governor had told the Board of Elections to send out absentee ballot applications to every voter in the state and to include a provision where somebody could set a temporary disability due to coronavirus. That is unprecedented and that probably will result in 80-90% of people who are going to vote in voting utilizing the absentee ballot. I'm not sure what experience and expertise they had there or the experience and expertise they had in running elections. In fact, the CDC has put out, I think we cited to it in our brief, the CDC has put out a guidance for states on how to run elections and not one word in that guidance says postpone them. It talks about all kinds of alternative measures that could be taken at polling places. It certainly promotes balloting by mail. Finally, I just wanted to say something about the counties, the upstate counties that council mentioned. The five counties that were mentioned, and we did put in a document citing to the Board of Elections statistics, those five counties have 61,767 active Democrats, 6.3 million in the state. Even in Staten Island, which they cite to, we cite in our request for judicial notice that there's a Senate primary that half the Democrats in Staten Island are eligible to vote in that primary. They talk about two election districts in Queens, in Brooklyn. Those two election districts have about 1,000 Democrats in them out of 1.1 million in the county. The places where there are not primaries going on are few and far between. That being said, I will cease talking. Thanks very much, Mr. Schwartz. Judge Kugin, do you have any questions for Mr. Schwartz? I do not, thank you. Judge Jacobs? No, thank you. Thanks very much. We'll hear now, I gather, from Mr. Curzon. Yes, Your Honor. Good afternoon. This is Jeff Curzon, attorney for Epoese. We are asking you to affirm Judge Torres' decision. With everything we submit before you today, we ask that in your deliberations, you keep in mind the following three points. One, Andrew Yang is not only a candidate who qualified for the ballot for President of the United States, Andrew Yang is a citizen of the United States and a registered Democratic Party voter, just like more than six million other New Yorkers. Two, Jonathan Herzog, Helen Tse, Brian Vogel, Shlomo Small, Alison Wang, Kristen Medeiros, and Dr. Roger Green are not only delegate candidates who qualified for the ballot, they are also citizens of the United States and registered Democratic Party voters. Furthermore, Mr. Jonathan Herzog is a so-called down-ballot candidate whose rights have been further impacted by the Board's decision. Third, the right to vote, and I apologize to the Court if this is repetitive or of such common knowledge that it doesn't need to be said, but I think it's worth reiterating, the right to vote is the most important right as it determines our economic rights, which in turn determines the other civil rights we have. In other words, as has been said many times before, the right to vote is legally effective speech under the First Amendment. To cancel an election in progress has no justification weighing the state's alleged compelling interests. Please affirm Judge Torres' decision because the burden on Yang was severe. He did everything he was supposed to do as a presidential candidate, and then the legislature and the Board changed the rules. Candidates have continued to gain delegates after stopping active campaigns across many modern elections. Yang, and Senator Sanders as well, wanted to maintain influence in the Democratic Party after suspending their campaign. That was always clear. This is how the game is played. If you're going to be president, or if you're not going to be president, then you want the campaign of the person who is going to be president to reflect your beliefs. And I believe Judge Cabranes, you were correct when you pointed out the potential for influence with respect to a vice presidential campaign. Moreover, the party platform and rules are equally important. These are some of the most powerful First Amendment rights that there are. Then Yang got hit hard a second time as a voter who wanted to vote for the delegates that shared his beliefs. The Yang delegates did everything right as well. They got 20,000 petitions signed, very similar to Yang, who just got over 20,000 petitions signed from registered voters. And then this retroactive law of April 3rd this year, Section 122A, 13, and 14 wasn't fair. It was in fact illegal. Even if your honors would uphold it as challenges of prospective law, there's no way it should have been applied midstream to people who had already done everything right. And due to the severity of the burden, this is the classic strict scrutiny case or close scrutiny in the realm of cases we've seen before in the Supreme Court, such as Smith and Allwright or Westberg and Sanders. Under strict scrutiny, you don't ask whether there were ample alternative means, such as going into a smoke-filled room and asking the New York Democratic Party powers that be to appoint them. You ask, was this the least restrictive alternative? And there's no way it was, because obviously the least restrictive alternative is mailing ballots, first and foremost, and then masks and social distancing. There are all kinds of methods for running an election safely during a pandemic. And canceling an election is clearly an overreaction and undemocratic, and could be so severe as to possibly having violated such longstanding laws of Magna Carta. I mean, it's just appalling. The attorney general has said they could have simply unsuspended. But this is a middle-of-the-game rule change. The retroactive application must have affected Mr. Yang and others' First Amendment rights. When Yang suspended his campaign, he did not tell anyone, hey, take my name off the ballot. And if you look at the word suspend in the dictionary, it is by definition a temporary act. Now the board, what they did was they canceled the election on April 27th after it was in Congress, because the attorney general admits in their reply that March 17th was the date that ballots started going out to our military and overseas voters. But they have allowed the primaries throughout all over the state to continue in person. And we submit that the driving reason behind their decision to cancel this election was never public health. In fact, the resolution of April 27th never even mentioned the pandemic. And if the court does not agree on this strict scrutiny standard, then the severity of the burden still pulls us to the upper end of the Anderson verdict balancing scale. When you actually kick people off the ballot, there are not ample alternative means for them to exercise their First Amendment rights of free speech and freedom of association. The state's interest in protecting people against COVID-19 could be fully served by mail-in ballots, masks, and social distancing. Also, the Board of Elections is not, and we pointed this out in our briefs, is not the agency tasked with public health issues. So no deference should be paid to their public health arguments, even if the numbers they cite are correct, which we contend that they are not. And again, the board didn't even make the public health case when they passed the resolution without opportunity for plaintiffs to be heard. All this court needs to do is read the Amici briefs, in particular the healthcare workers brief, and pay attention to the voters briefs, where some of the voters actually joined the Democratic Party just so that they could express themselves in this election. Other states have struck the balance far better, and New York, as was noted earlier, is the only one to try and cancel this election. No doubt an election in progress. Delegates that would be selected in a smoke-filled room will not reflect plaintiffs' interests, who may want to choose a different vice president, for example. The rights bestowed on Yang, and similarly Sanders, and the delegates, are by extension and consequence bestowed also on the voters. And we submit, as employees and intervenors have noted in their briefs, that the due process and equal protection claims are just as strong as our First Amendment claims. If the state can so easily cancel our First and Fourteenth Amendment rights, what rights will they attempt to cancel next? For the reasons we've given, as well as those of intervenors and amicis, we are asking you to affirm the district court's decision. Thank you, your honors. Thank you, Mr. Curzon. Judge Kears, any questions for Mr. Curzon? No, thank you. Judge Jacobs. Mr. Curzon, you said that the driving reason for this election change was never the pandemic, so here goes. What was the driving reason? What was the driving reason? That should be the subject of many editorials and op-eds in the future, your honor. But we perhaps will determine it through discovery in the district court, but I don't think it's appropriate for me to speculate it at this time, except to say that the attorney general's argument about health seems very spurious, akin to a red herring, false fake, and perhaps purely for political reasons. Could you lay out for me, you referred also to the down-ballot impact. I guess it's clear that if people who are adherents of a particular viewpoint don't vote or don't come to the polls, that'll affect the down-ballot. But that's a very vague way of describing it. Can you particularize what the effect would be or what you claim it would be with respect to the down-ballot candidate? Well, your honor, Justice Brandeis' words come to mind in that the highest-ranking position in our democracy is that of citizens. So please take that in mind when I say that the most popular election or the election where citizens choose to exercise their rights, and that's the important distinction about the right to vote, is that it's a choice to vote as well as to not vote. But in terms of the presidential election, I think the court could easily take judicial notice of the fact that turnout in these elections is much higher. And when you have the so-called down-ballot primaries, which traditionally had much lower turnout, you can see that by canceling the presidential election, you're also canceling the voices of many others who would basically be going to the polls and not staying home because they are enticed by the very fact that they get to have their sliver of sovereignty in determining our next president of the United States and the Democratic Party platform. But the people who want their sliver of sovereignty, they can go to the polls and vote for the down-ballot candidates of their choice. Yes, they can, but what we're saying is simply that there'll be less people doing that. So candidates such as Jonathan Herzog, if this election is allowed to be canceled, would get a much lower percentage of the electorate voting for him. And that's not only true for him, it's true for the state assembly candidates and the state senate candidates. And to the prior question, I think it could possibly be related. But again, I don't think it's really time to speculate on that. Would this law be valid if it were not enacted, if it were enacted, say, last October? Well, that's a great question. If the law were enacted last October, or if it were enacted so as to only apply to the 2024 election, then I think the candidates would properly be put on notice and that it would be part and parcel of the ballot access. But here, ballot access began in January. And whether you argue that the election began at that period when the ballot access rules were set, or at the date, March 17th, when the first ballot went out. And by the way, the ballots are continuing to go out. And what the state, I guess, wants to do is claw back those votes and say, they don't matter. But the election has begun in progress. So the question, if it were enacted in October, then counsel for the campaigns, as well as the candidates, would be aware of the ramifications possibly of suspending. However, that really is a due process question and not related to First Amendment. We're arguing here that the rules were changed midstream, and that was improper and illegal. Thank you. Thank you, Yaron. Thank you. Let me just be sure that we've exhausted our questions for attorneys Green, Schwartz, and Kershaw. Does Kearse have any questions for any of them? No further questions. Thank you. Judge Jacobs? I have no further questions. Fine. Thanks very much. We'll hear from Thank you, Your Honor. A couple points. First, the unity of the contest between the nomination and the delegates does matter. And under the statute, the candidate cannot suspend their nomination, the race for nomination, without also suspending the campaign for delegates. And to be sure, there may be many reasons why a candidate would want to keep an active campaign for delegates, even if they can't win the ultimate nomination. And they want their delegates, some to be allocated, and to have various types of influence. But the candidates here did not do that. They suspended their campaigns, and they did not reactivate them in order to try to have delegates get allocated and to have influence at the convention. And to go forward, notwithstanding the suspension, and that he wanted his delegates to stay on the ballot, notwithstanding the suspension, but he did not say that he was unsuspending his campaign, or that he was, again, seeking the nomination for himself, rather than endorsing former Vice President Biden. And if Senator Sanders thought that his letter was not under the statute, to mean that it should not have been applied to him, or that it was applied incorrectly, New York law has a very specific electoral law fast-track procedure for candidates to challenge a decision that removes them from the ballot and renders a contest uncontested. And the court in Rivera-Powell said that that procedure is available and sufficient to provide procedural due process if a question about the New York statute and how it should be interpreted or person comes up. But no such challenge was brought here. I also want to emphasize that although the members of the board are not claiming to be medical experts, they do have extensive experience and expertise in running elections. And there is really no dispute that this decision was made and that the primary is going to be held as it goes forward during a historic and devastating pandemic in which New York is the epicenter. And to say that that context didn't matter either for the legislature or the board, I think it really ignores the reality that everybody is facing and the serious risk to health and election administration. I have one more. Yes, I second you. I also wanted to touch on the idea that the presidential race was sort of singled out in some special way. Even though this statute only addresses the presidential race, it is already the case that there are other primaries that are still in litigation right now over whether there will be end up two or only one candidate on the ballot. And if those litigations end and only one candidate being in the ballot, then those primaries also will not go forward because that is a longstanding procedure under New York law. As to other states, I want to emphasize again that New York, it is and sadly continues to be the epicenter of the pandemic. And so to the extent that the steps that they took doesn't have a precedent, I think that's because New York was facing an unprecedented situation. Connecticut and New Jersey have postponed their primaries. Connecticut, I believe, is in August and New Jersey is in July. And right now, they have not done anything further than postpone it. But I can't say what those states may or may not do going forward, depending on what happens with the pandemic. And then finally, I will just touch on this point about down ballot races. The presidential primary was originally supposed to be in April and was entirely separate from those down ballot races. And so not holding the uncontested presidential primary really returns those races to the status quo that they had before. And the fact that having the presidential primary might very well mean that there are many more voters who come out to vote is precisely why having the uncontested presidential primary, the board reasonably decided, would mean more people coming out of their homes, putting themselves at risk, having more co-workers, more poll sites, and everything that goes along with that. And it was in that context that the board reasonably decided that conducting the uncontested presidential primary raised too many risks to health and election administration, given what the state and the board was facing. All right. Judge Kears? No questions. Thank you. Judge Jacobs? In terms of the significance of suspension, surely the suspension by Mr. Yang and his endorsement of Vice President Biden doesn't mean that Mr. Yang considers that Vice President Biden is discreditable or that Mr. Yang wouldn't run if nominated. So I'm not sure I understand what the endorsement really means. You seem to think that it is simply a throwing in of the towel. Well, I mean, the suspension is the key under the statute, to be sure. But the endorsement of the other candidate, as a practical matter, also does show that the candidate is endorsing not only that together. So if you urge people to vote for former Vice President Biden, you are also, if they do that, they are voting for former Vice President Biden's delegate. Thank you. All right. I think that concludes our oral audience. But I do think that Senator Sanders and David West have been present for this argument. Staff of Senator Sanders, in case the court has any questions or something comes up, I would take it that they have formally entered appearances. Is that right? We have indeed, Your Honor. Please, the court. Yes. This is Malcolm Seymour of the law firm Foster Garvey. And we have appeared as a counsel to the Amici Trier in this case. And that's true of Mr. West as well. Is that right? That's right. Mr. David West. And that's correct. Okay. I just wanted to have the clerical matters clear that you entered appearances and you were present for the oral argument. And whatever decision we come up with will reflect that fact. All right. I think we are ready to take the matter under submission and to adjourn court. Madam Clerk, would you please adjourn? Sure. Court stands adjourned.